UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE APPLICATION OF CABLE NEWS NETWORK, INC., AMERICAN BROADCASTING COMPANIES, INC. d/b/a ABC NEWS, THE ASSOCIATED PRESS, BUZZFEED, INC. d/b/a BUZZFEED NEWS, CBS BROADCASTING INC. o/b/o CBS NEWS, DOW JONES & COMPANY, INC., PUBLISHER OF THE WALL STREET JOURNAL, GANNETT CO., INC., GRAY MEDIA GROUP, INC., NATIONAL PUBLIC RADIO, INC., NBCUNIVERSAL MEDIA, LLC d/b/a NBC NEWS, THE NEW YORK TIMES COMPANY, PRO PUBLICA, INC., TEGNA, INC., and WP COMPANY LLC, d/b/a THE WASHINGTON POST FOR ACCESS TO CERTAIN SEALED VIDEO EXHIBITS | : : : : : : : : : : : : : : | No. 21-mc-34 |

**UNITED STATES' OPPOSITION TO EXPEDITED MOTION FOR PUBLIC ACCESS TO CERTAIN SEALED VIDEO EXHIBITS**

The United States of America hereby submits this opposition to the Press Coalition's Expedited Motion for Access to Certain Sealed Video Exhibits. The motion should be denied because this Court lacks authority to order the public release of exhibits filed in another district. It is also meritless. Neither the Supreme Court nor the D.C. Circuit have recognized a First Amendment right of access to exhibits submitted during a detention hearing. And the common-law right of access balancing test weighs in favor of preventing the public from making copies of and distributing the videos at this time.

### BACKGROUND

On March 6, 2021, United States Magistrate Judge Zia M. Faruqui issued warrants for the arrests of Julian Elie Khater and George Pierre Tanios based upon their involvement in the January 6, 2021, attack on the United States Capitol. *See* Criminal Complaint and Arrest Warrant (ECF No. 1), *United States v. Khater and Tanios*, No. 21-cr-222-TFH (D.D.C.). Surveillance footage

showed Khater and Tanios "working together to assault law enforcement officers with an unknown chemical substance by spraying officers directly in the face and eyes." *Id.* at 2. Judge Faruqui found probable cause that Khater and Tanios had committed various crimes and issued warrants for their arrest. *Id.* at 8-10; Arrest Warrant for Khater (ECF No. 5); Arrest Warrant for Tanios (ECF No. 6).

Subsequently, on March 17, 2021, a grand jury indicted Khater and Tanios for conspiracy to impede or injure an officer, in violation of 18 U.S.C. § 372; three counts of assaulting, resisting, or impeding certain officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b), and 2; civil disorder, in violation of 18 U.S.C. § 231(a)(3); obstructing or impeding an official proceeding, in violation of 18 U.S.C. § 1512(c)(2); entering and remaining in a restricted building or grounds with a deadly or dangerous weapon and causing significant bodily injury, in violation of 18 U.S.C. §§ 1752(a)(1), (b)(1)(A) and (b)(1)(B); disorderly and disruptive conducing in a restricted building or grounds with a deadly or dangerous weapon and causing significant bodily injury, in violation of 18 U.S.C. §§ 1752(a)(2), (b)(1)(A) and (b)(1)(B); engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon and causing significant bodily injury, in violation of 18 U.S.C. §§ 1752(a)(4), (b)(1)(A) and (b)(1)(B); and engaging in an act of physical violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F). *See* Indictment (ECF No. 8).

On March 14, 2021, three days before he was indicted, Tanios was arrested in Morgantown, West Virginia. *See* Arrest Warrant for Tanios (ECF No. 6). On March 22, 2021, United States Magistrate Judge Michael John Aloi in the Northern District of West Virginia conducted a preliminary/detention hearing after which he ordered Tanios to be transferred to this District and

detained pending trial. *See* Commitment to Another District and Detention Order (ECF No. 26), *United States v. Tanios*, No. 21-mj-27-MJA (N.D.W.V.); Detention Order (ECF No. 28), *United States v. Tanios*, No. 21-mj-27-MJA (N.D.W.V.). At that hearing, the government introduced into evidence 10 videos of events that occurred during the Capitol Attack. *See* Exhibit and Witness List (ECF No. 25), *United States v. Tanios*, No. 21-mj-27-MJA (N.D.W.V.). Six of those videos were from permanent, stationary cameras that are part of the U.S. Capitol Police's closed-circuit video system; three were from police officers' body-worn cameras; and one was obtained from open source media. *See* 3/22/21 Transcript (ECF No. 30) at 30-35, *United States v. Tanios*, No. 21-mj-27-MJA (N.D.W.V.). Some of the videos were played in full during Tanios's detention hearing; for others, only clips were played. *See id.* at 30, 35.

After being unable to obtain copies of the videos from the clerk's office in the Northern District of West Virginia, the Press Coalition now moves this Court for an order unsealing the videos and "direct[ing] the Clerk to release the records to the public immediately." Memorandum of Points and Authorities in Support of Expedited Motion for Public Access to Certain Sealed Video Exhibits (Motion) at 2. Although the Press Coalition's Motion at times appears to seek only copies of the "police body-worn camera ('body cam') video recordings," Motion at 1, the government has spoken with counsel for the Press Coalition and clarified that it seeks copies of all of the videos introduced during Tanios's detention hearing. Due to the Capitol Police's strong privacy and security interests in preventing the public disclosure of the videos sought by the Press Coalition, the government opposes the Press Coalition's motion insofar as it seeks to copy and further disseminate those videos.

3

**ARGUMENT**

I.     **This Court Lacks Authority to Grant the Requested Relief.**

The videos that were introduced as exhibits during Tanios's detention hearing are not on file with or in the possession of this Court. Instead, they were submitted as exhibits in the Northern District of West Virginia and remain in that court's possession. This Court thus lacks the authority to grant the relief that the Press Coalition seeks.

As the Supreme Court has explained, "[e]very court has supervisory power over its own records and files[.]" *Nixon v. Warner Commc'ns*, 435 U.S. 589, 598 (1978). Whether to release judicial records therefore "is a question for the courts in which those documents were filed." *United States v. Scully*, No. 10-CR-593(DAE), 2013 WL 3338593, at *4 (E.D. Tex. July 2, 2013). Consistent with this conclusion, numerous courts have found that they lack the authority to unseal materials placed under seal by a different court. *See, e.g.*, *In re Application & Affidavit for a Search Warrant*, 923 F.2d 324, 328 (4th Cir. 1991) ("The affidavit was initially filed appropriately with that court and could be unsealed only by that court."); *In re Granick*, No. 16-mc-80206-KAW, 2018 WL 7569335, at *15 (N.D. Cal. Dec. 18, 2018) ("Petitioners would essentially require that one judge modify or rescind the sealing orders signed by his or her fellow judges. Such actions would seem to go beyond a court's supervisory power over its own records and files, reaching to the orders and cases of other judges, untethered from the individual facts and circumstances of those cases."); *Scully*, 2013 WL 3338593, at *4 ("[B]ecause this Court does not have the authority to unseal search-warrant materials filed in another district, Gourmet Express's Motion to reproduce those materials is denied."); *Estate of Frank P. Lagano v. Bergen County Prosecutor's Office*, No. 12-5441, 2016 WL 7448181, at *2 (D.N.J. Nov. 9, 2016) ("whether the state investigative records

4

at issue should be unsealed is a question for the court in which those documents were initially filed and sealed"); *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, No. DKC 2002-1565, 2007 WL 9782461, at *5 (D. Md. Sept. 17, 2007) ("This court lacks the authority to review the decision of its sister court to place these briefs under seal[.]"); *United States v. Graves*, No. 6-cr-74-BR, 2006 U.S. Dist. LEXIS 67474, at *1 (W.D.N.C. Sept. 19, 2006) (concluding that the court "does not have jurisdiction to rule on this motion" to unseal the affidavit supporting a search warrant sealed by a different district court); *Casler v. Bressler*, No. 02-cv-5763-AWI-DLB, 2005 U.S. Dist. LEXIS 50123, at *14 (March 21, 2005) ("only the court that seals an affidavit and warrant may unseal it").

The videos that the Press Coalition seeks to obtain were introduced into evidence before a magistrate judge in the Northern District of West Virginia and it is that judge who must determine whether they are appropriately released to the public. This conclusion remains unaffected by the fact that Tanios was detained pursuant to an arrest warrant issued in this jurisdiction and is facing criminal charges here. A "court's supervisory power over its own records and files" does not "reach[ ] to the orders . . . of other judges," even those sitting in the same district. *In re Granick*, 2018 WL 7569335, at *15. Indeed, courts routinely conclude that it is only the sealing court that has authority to unseal warrant-related materials, even when those warrants uncover evidence relevant to criminal charges brought in a different jurisdiction. *See, e.g.*, *In re Application & Affidavit for a Search Warrant*, 923 F.2d at 328; *Scully*, 2013 WL 3338593, *4; *Graves*, 2006 U.S. Dist. LEXIS 67474, at *1. The same principal applies here. Because the videos at issue were filed as exhibits before a United States Magistrate Judge in the Northern District of West Virginia, it is that judge who must determine whether they should be released publicly.

5

**II.     The Motion Should be Denied on the Merits.**

Were this Court to consider the Press Coalition's motion on the merits, it should deny it. As discussed below, the Press Coalition identifies no authority to support its assertion that there exists a First Amendment right of access to exhibits submitted during a detention hearing. And although the common-law right of public access to judicial records does apply to those exhibits, the applicable balancing test weighs in favor of preventing the public from making copies of and distributing the videos at this time.

>    A.     The Press Coalition identifies no authority for the proposition that there is
>            <u>a First Amendment right of access to detention hearing exhibits.</u>

The Press Coalition asserts that "the constitutional right of access plainly attaches to the Video Exhibits." Motion at 9. This is incorrect. As discussed below, the government agrees that the common-law right of public access to judicial records applies to the videos submitted by the government during Tanios's detention hearing. But the Press Coalition identifies no authority for the proposition that the more demanding First Amendment right of access to criminal proceedings governs the disclosure of those exhibits.

In *Nixon*, the Supreme Court found it "clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." 435 U.S. at 597. Subsequently, the Court held that, in addition to this common-law right of access to judicial records, there exists a qualified First Amendment right of access to criminal proceedings. *See, e.g.*, *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8 (1986); *Richmond Newspapers v. Virginia*, 448 U.S. 555, 580 (1980). This qualified First Amendment right, however, only applies "where (i) there is an 'unbroken, uncontradicted history' of openness, and (ii) public access plays a significant positive role in the functioning of the proceeding." *United*

6

*States v. Brice*, 649 F.3d 793, 795 (D.C. Cir. 2011) (quoting *Richmond Newspapers*, 448 U.S. at 573). The relevant question is whether the specific type of document or aspect of the court proceedings meets this test. *See, e.g.*, *United States v. El-Sayegh*, 131 F.3d 158, 160 (D.C. 1997) ("The First Amendment guarantees the press and the public access to aspects of court proceedings, including documents, 'if such access has historically been available, and serves an important function of monitoring prosecutorial or judicial misconduct.'") (quoting *Washington Post v. Robinson*, 935 F.2d 282, 288 (D.C. Cir. 1992)); *Robinson*, 935 F.2d at 288 (evaluating whether plea agreements meet the First Amendment test).

The Press Coalition cites no case holding that the First Amendment right of access applies to exhibits submitted during a detention hearing. To the contrary, the Supreme Court held in *Nixon* that the First Amendment right to freedom of the press did not give the press "the right to copy and publish [ ] exhibits and materials displayed in open court." 435 U.S. at 609. Citing *Nixon*, numerous circuits have held that the First Amendment right of access likewise "d[oes] not confer the right to replicate evidentiary materials in the custody of the court." *In re Providence Journal Co.*, 293 F.3d 1, 16 (1st Cir. 2002); *see also United States v. Webbe*, 791 F.2d 103, 105 (8th Cir. 1986) ("CBS' argument that its right of access to the tapes is guaranteed by the First Amendment was rejected by the Supreme Court in *Nixon*[.]"); *United States v. Beckham*, 789 F.2d 401, 409 (6th Cir. 1986) ("If a right to copy the tapes and transcripts in this case exists, it must come from a source other than the Constitution."); *Belo Broad. Corp. v. Clark*, 654 F.2d 423, 428 (5th Cir. 1981) ("Our reading of *Richmond Newspapers* convinces us that the holding of *Warner Communications* that the press enjoys no constitutional right of physical access to courtroom exhibits remains undisturbed."). If the First Amendment right of access does not apply to evidence

7

presented during a criminal trial, it cannot possibly apply to materials submitted during a detention hearing. Consistent with that conclusion, the Second Circuit and a judge in this district have applied only the common-law right-of-access test to evidence submitted at a detention hearing. *See United States v. Graham*, 257 F.3d 143, 151-53 (2d Cir. 2001); *United States v. Jackson*, No. 21-mj-115, 2021 WL 1026127, at *5-6 (D.D.C. March 17, 2021) (Howell, C.J.).

In its Motion, the Press Coalition makes no attempt to demonstrate that, for exhibits submitted during a detention hearing, "(i) there is an 'unbroken, uncontradicted history' of openness, and (ii) public access plays a significant positive role in the functioning of the proceeding." *Brice*, 649 F.3d at 795. Instead, the Coalition relies entirely on the fact that the qualified First Amendment right of public access to criminal proceedings "applies to pretrial proceedings as well." Motion at 9 (citing *Press-Enterprise*, 478 U.S. at 12-13). But in *Press-Enterprise*, the Supreme Court held only that the First Amendment right of public access applies "to preliminary hearings *as conducted in California*"—which involves "an elaborate preliminary hearing" that, "[b]ecause of its extensive scope[,] . . . is often the final and most important step in the criminal proceeding." 478 U.S. at 10-12 (emphasis added). And, more importantly, the D.C. Circuit has made clear that the question is not whether the First Amendment right of access applies to the class of proceeding generally, but rather to the specific "aspects of [the] court proceedings" or category of "documents" at issue. *See El-Sayegh*, 131 F.3d at 160; *Robinson*, 935 F.2d at 288; *see generally United States v. McVeigh*, 119 F.3d 806, 811 (10th Cir. 1997) ("A number of circuits have concluded that the logic of *Press–Enterprise II* extends to at least some categories of court documents and records, such that the First Amendment balancing test there articulated should be applied before such qualifying documents and records can be sealed."). Thus, even if the First

8

Amendment right of public access applies to detention hearings generally, that does not answer the question whether the right extends to evidence submitted at those hearings. The Press Coalition identifies no legal authority to support the conclusion that it does, and numerous Circuits have held that it does not apply to exhibits submitted during a criminal trial, much less those submitted at a detention hearing. This Court thus should not apply the constitutional test when determining whether to allow the Press Coalition to make copies of the videos at issue.

        B.      The common-law right-of-access balancing test weighs against the public release of all of the videos at this time.

The Press Coalition spends much of its Motion arguing that, because the videos it seeks to copy were played (either in full or in part) at Tanios's detention hearing, the government must demonstrate "extraordinary circumstances" to prevent the public from copying and further disseminating those videos. Motion at 7-8. This is not so. Rather, the D.C. Circuit has consistently employed a multi-factor balancing test when determining whether the common-law right of access to judicial records requires those records to be released publicly. Here, that test weighs against the public release of the videos at this time.

The common-law right of access to judicial records does not apply to all items filed with a court. *See SEC v. Am. Int'l Group*, 712 F.3d 1, 3 (D.C. Cir. 2013). Rather, "whether something is a judicial record depends on 'the role it plays in the adjudicatory process.'" *Id.* (quoting *El-Sayegh*, 131 F.3d at 163). When, for example, items "are 'intended to influence' the court and the court 'ma[kes] decisions about them[,']" *Leopold v. United States*, 964 F.3d 1121, 1128 (D.C. Cir. 2020) (quoting *MetLife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 668 (D.C. Cir. 2017), then they are judicial records. Here, the government does not dispute that the videos submitted as exhibits during Tanios's detention hearing are judicial records. *See, e.g.*, *Graham*, 257 F.3d at 151-

9

53 (finding that tapes played at a detention hearing were judicial records); *Jackson*, 2021 WL 1026127, at *4-5 (same as to videos).

Because the videos are judicial records, "there is a 'strong presumption in favor of public access'" to them. *Leopold*, 964 F.3d at 1127 (quoting *United States v. Hubbard*, 650 F.2d 293, 317 (D.C. Cir. 1980)). However, "that presumption may be outweighed by competing interests." *Id.* To weigh those competing interests, the D.C. Circuit uses the six-factor "*Hubbard* test" that "'has consistently served as [its] lodestar' for evaluating motions to seal or unseal judicial records[.]" *Id.* (quoting *MetLife*, 865 F.3d at 666). Thus, in this jurisdiction, "when a court is presented with a motion to seal or unseal, it should weigh: '(1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial proceedings.'" *MetLife*, 865 F.3d at 665 (quoting *EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996)).

In its Motion, the Press Coalition treats factor (2) of the *Hubbard* test as effectively dispositive, arguing that, "[o]nce records have been shown in open court," the government must identify "extraordinary circumstances" to prevent the press from copying and further disseminating them. Motion at 7-8. That is not so, for a variety of reasons. First, the Press Coalition's argument in this regard is based on language in a decades-old, unpublished D.C. Circuit memorandum opinion in *United States v. Thompson*, No. 89-3160, 1989 U.S. App. LEXIS 19909, 1989 WL 248625 (D.C. Cir. Oct. 13, 1989). But that "extraordinary circumstances" standard has never been adopted by the Circuit in a published opinion in the 40 years since the Second Circuit

10

asserted it in *United States v. Myers*, 635 F.2d 945, 952 (2d Cir. 1980), which *Thompson* simply quoted. And the Press Coalition's suggested "extraordinary circumstances" standard is inconsistent with the *Hubbard* test, which has "consistently served as [the D.C. Circuit's] lodestar for evaluating motions to seal or unseal judicial records," *Leopold*, 964 F.3d at 1127 (quotation marks omitted), and under which "the extent of previous public access" is but one factor in a multi-factor balancing test, *id.* at 1131. Indeed, in *Nixon*, the Supreme Court held that the common-law right of access to judicial records did not require the court to allow the press to make copies of tape recordings played during trial even when transcripts of those recordings had been widely reprinted in the press. 435 U.S. at 594, 608. Finally, *Thompson* itself involved transcripts of wiretapped conversations where the conversations were played in open court and thus "the press could generate its own transcripts." 1989 WL 248625, at *1. Here, in contrast, although press reports may have described the videos at issue based on what the reporters saw during Tanios's detention hearing, *see* Motion at 8, nobody is currently able to reproduce and publicly disseminate those videos, which is an important consideration discussed further below.

Rather than look to whether "extraordinary circumstances" exist to prevent the public from reproducing and disseminating the videos at issue, this Court should apply the six-factor *Hubbard* test, which weighs in favor of keeping the videos from being released to the public at this time.

   *1.      The need for public access to the documents at issue*

For many of the reasons discussed by the D.C. Circuit in *Hubbard* itself, this factor does not weigh in favor of public release of the videos. The Press Coalition's motion "does not involve access to the courtroom" or "to documents which have been introduced as evidence of guilt or innocence in a trial[.]" *Hubbard*, 650 F.2d at 317. Moreover, "[t]he public in this case had access,

11

*inter alia*, to the courtroom proceedings . . . , to the memoranda filed by the parties . . . , [and] to the trial judge's memorandum decision[.]" *Id.* at 317-18. Indeed, the Press Coalition recognizes that its members were able to view the videos when they were played during Tanios's detention hearing and to report upon what they saw. *See* Motion at 5, 7-8. The public thus has minimal need to take the additional step of copying and reproducing the videos at issue. *See generally CNN, Inc. v. FBI*, 984 F.3d 114, 119 (D.C. Cir. 2021) ("A district court weighing the first factor should consider the public's need to access the information that remains sealed, not the public's need for other information sought in the overall lawsuit.").

The Press Coalition nevertheless asserts that, because the magistrate judge in West Virginia "referred to video footage many times throughout the decision to keep Tanios detained before trial," there is "a particular 'need for public access'" here because the exhibits "'are specifically referred to in the trial judge's public decision.'" Motion at 11 (quoting *Nat'l Children's Ctr., Inc.*, 98 F.3d at 1409). Although that may be true in a case like *National Children's Center*, where the public never had access to the documents referenced in the public decision, 98 F.3d at 1408, the need for public access is surely less here, where the public and members of the press were able to watch the videos and report upon them, and where other videos "of these suspects and the events in question have already been widely disseminated[,]" Motion at 8.

                2.        *The extent of previous public access to the documents*

The government recognizes that, because the videos at issue were played during Tanios's detention hearing, this factor weighs against preventing the public from copying and further disseminating those videos. *See Hubbard*, 650 F.2d at 318 ("Previous access is a factor which may weigh in favor of subsequent access."). But, as discussed above (at 10-11), that fact is not

12

dispositive. Indeed, the Supreme Court held in *Nixon* that the common-law right of access to judicial records did not require the court to allow the press to make copies of tape recordings despite the fact that the recordings had been played during trial. 435 U.S. at 594, 608.

### 3. The fact that someone has objected to disclosure

The fact that the government has objected weighs against disclosure. *See Nat'l Children's Ctr.*, 98 F.3d at 1410 (finding that "the fact that the Center has objected" weighed against public disclosure); *Hubbard*, 650 F.2d at 319 ("the strength with which a party asserts its interests is a significant indication of the importance of those rights to that party"). Tanios has not taken a position one way or the other on whether disclosure is appropriate. *See* Notice (ECF. No. 3), *In re Application of Cable News Network, Inc., et al., For Access to Certain Sealed Video Exhibits*, No. 21-mc-34 (D.D.C.).

### 4. The strength of any property and privacy interests asserted

As discussed in the attached declaration from the General Counsel for the United States Capitol Police, the U.S. Capitol Police has a strong privacy interest in the videos from its closed-circuit video system. *See* Declaration of Thomas A. DiBiase (Attachment A) ¶ 1. Access to that video system "is strictly limited," and "[t]he disclosure of any footage" from the closed-circuit video cameras is likewise "strictly limited and subject to a policy that regulates the release of footage." ¶ 4. The release of any footage must be authorized by the Capitol Police Department's second-highest officer, and the Capitol Police's General Counsel's office "has consistently taken a restrictive view of releasing camera footage in cases other than serious crimes or national security." ¶¶ 4, 6. Even when the Capitol Police provides video footage in criminal cases, it does so pursuant to a protective order that prevents it from being reproduced or further disseminated.

¶ 7. Here, the Capitol Police's concern with the release of video from its closed-circuit camera system is particularly acute, given the possibility "that providing unfettered access to hours of extremely sensitive information to defendant show have already shown a desire to interfere with the democratic process will result in the layout, vulnerabilities and security weaknesses of the U.S. Capitol being collected, exposed and passed on to those who might wish to attack the Capitol again." ¶ 14. The Capitol Police thus has a strong privacy interest that weighs against further public dissemination of the videos from its closed-circuit video system. *See generally CNN*, 984 F.3d at 120 ("a district court weighing the fourth *Hubbard* factor should consider whether secrecy plays an outsized role in the specific context"); *MetLife*, 865 F.3d at 672 ("continued confidential treatment of sensitive information is still possible under *Hubbard*"); *In re Sealed Case*, 237 F.3d 657, 666 (D.C. Cir. 2001) (explaining that a statute and the "regulations interpreting the statute create an extraordinarily strong privacy interest in keeping the records sealed"); *Hubbard*, 650 F.2d at 315-16 ("The public has in the past been excluded, temporarily or permanently, from court proceedings or the records of court proceedings . . . to guard against risks to national security interests").

### 5.    *The possibility of prejudice to those opposing disclosure*

For many of the same reasons just discussed, the Capitol Police may suffer serious potential prejudice if videos from its closed-circuit camera system are released publicly so that they may be repeatedly copied, studied, and further disseminated. The public's ability "to copy or disseminate such footage would provide the defendants or others to whom it is released with a clear picture of the interior of the Capitol, including entry and exit points, office locations, and the relation of the crucial chambers and areas (such as the Speaker's Office or Majority Leader's Office) to other

areas of the Capitol." DiBiase Decl. ¶ 7. Although the Capitol Police is most concerned about the public dissemination of closed-circuit video from the Capitol's interior, the possibility of the same type of prejudice arises from public dissemination of closed-circuit video from the Capitol's exterior of the kind at issue in this case, which similarly could allow the "vulnerabilities and security weaknesses of the U.S. Capitol being collected, exposed and passed on to those who might wish to attack the Capitol again." ¶ 14. And even if that possibility does not exist with respect to the specific videos sought by the Press Coalition, the public dissemination of numerous such videos may, "in the aggregate," create just the risk the Capitol Police seek to avoid. ¶ 16 & n.6. The possibility of prejudice to the Capitol Police's ability to protect the U.S. Capitol and the Members of Congress who work there thus weighs against allowing the Press Coalition to copy and further disseminate those videos. *See CNN*, 984 F.3d at 120 ("a district court weighing the fifth *Hubbard* factor should consider the dire consequences that may occur); *Dhiab v. Trump*, 852 F.3d 1087, 1096-97 (D.C. Cir. 2017) ("The government's expert judgment was that militants could study the recordings repeatedly and slowly, looking for 'patterns' of 'mistakes' not identifiable from firsthand experience or written descriptions. Even if the recordings contained no new information, the government thus demonstrated good cause for sealing them.") (citation omitted); *Hubbard*, 650 F.2d at 315-16 (noting that materials may be sealed "to guard against risks to national security interests"); *cf. Robinson*, 935 F.2d at 291 ("evidence that the release of a plea agreement may threaten an ongoing criminal investigation, or the safety of the defendant and his family, may well be sufficient to justify sealing a plea agreement"). Indeed, another judge in this District recently sealed three videos from the Capitol Police's closed-circuit video system after finding that "there are reasonable grounds to believe that the disclosure of such materials could

jeopardize national security[.]" 4/1/21 Order (ECF No. 25), *United States v. Sandlin*, No. 21-cr-88-DLF.

### 6. The purposes for which the documents were introduced

The government submitted the videos to the court in the Northern District of West Virginia as part of its determination whether to detain Tanios pending trial, and thus this factor weighs against the government. *See, e.g.*, *Jackson*, 2021 WL 1026127, at *8.

\*   \*   \*

Here, the Capitol Police's significant privacy interests and the possibility of harm to the security of the U.S. Capitol that may arise from the public dissemination of those videos outweighs the fact that those videos were played a single time at Tanios's detention hearing. As the D.C. Circuit recognized in *Dhiab*, even where video recordings "contain[ ] no new information" than that already made public, the government may have an interest in preventing the public release of those videos, where they may be "stud[ied] . . . repeatedly," thus revealing vulnerabilities and security weaknesses "not identifiable from firsthand experience or written descriptions." 852 F.3d at 1096-97. That is precisely the Capitol Police's concern here. *See* DiBiase Decl. ¶¶ 14-16. The Court should thus deny the Press Coalition's Motion insofar as it seeks to make copies of and disseminate the videos introduced during Tanios's detention hearing.[1]

---

[1] If this Court does not deny the Press Coalition's motion based on its lack of authority to grant the relief the Press Coalition seeks, the government does not oppose the Court ordering disclosure of the single video it obtained from open source media, which was Exhibit 5 at Tanios's detention hearing. *See* 3/22/21 Transcript (ECF No. 30) at 30-31, *United States v. Tanios*, No. 21-mj-27-MJA (N.D.W.V.).

### III. CONCLUSION

For the foregoing reasons, the Motion should be denied.

                              Respectfully submitted,

                              CHANNING D. PHILLIPS
                              Acting United States Attorney
                              D.C. Bar No. 415793

By: /s/ Dineen A. Baker
       Dineen A. Baker
       D.C. Bar No. 487820
       Assistant United States Attorney
       United States Attorney's Office for the District of Columbia
       555 Fourth Street, NW
       Washington, DC 20530
       202-252-6954
       *dineen.baker@usdoj.gov*