**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE APPLICATION OF CABLE NEWS NETWORK, INC., et al., FOR ACCESS TO CERTAIN SEALED VIDEO EXHIBITS | Case No. 1:21-mc-34-TFH |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF THE PRESS COALITION'S EXPEDITED MOTION FOR ACCESS TO CERTAIN SEALED VIDEO EXHIBITS**

On March 24, 2021, fourteen national news organizations (the "Press Coalition") moved to unseal judicial records, specifically videos (the "Video Exhibits") that were displayed and filed as evidence in *United States v. Tanios*, one of many criminal cases pending in this District against defendants accused of committing violent crimes during the January 6, 2021 riot at the United States Capitol. The Government showed these videos in open court and entered them as exhibits in support of its motion to detain Defendant George Tanios before trial. The United States Magistrate Judge made clear that his decision to keep Tanios in custody was based in large part on these videos. As the Press Coalition explained, the public therefore has a right of access to the videos under the First Amendment and the common law. *See* Mem. in Supp. of Expedited Mot. for Pub. Access ("Mem.") at 6-12, Dkt. 1-1.

Last month, one of the press organizations in this Coalition requested access from another Court in this District to video exhibits of precisely the same type sought here, and which were also shown at a Capitol Riot defendant's detention hearing. *See United States v. Jackson*, 2021 U.S. Dist. LEXIS 49841, at *2 (D.D.C. Mar. 17, 2021). The Government took no position on that motion, but it opposes the Coalition's request in this case. The Government's objections here are baseless and the Court should reject them.

First, the Government erroneously attempts to deflect the entire matter to another court. It argues that this Court lacks authority to unseal the Video Exhibits, and that the decision rests

instead with the Northern District of West Virginia, where Tanios was arrested.  *See* Gov't's Opp. to Expedited Mot. for Pub. Access ("Opp.") at 4-5, Dkt. 4.  That argument, however, ignores Rule 5(c)(3)(E) of the Federal Rules of Criminal Procedure, which states that "when a defendant is transferred and discharged, the clerk must promptly transmit the papers and any bail to the clerk in the district where the offense was allegedly committed."  Because "the papers" of this case have been transferred here, this Court now is the appropriate forum and has full authority to release these judicial records.

Second, the Government asks the Court to disregard precedent, asserting that the First Amendment right of access does not apply to exhibits submitted during pretrial detention hearings.  Opp. at 6-9.  Courts across the country, however, have concluded just the opposite: the First Amendment does provide a right of access to the type of records at issue here, and because that right applies, the Government must release the Video Exhibits unless it can demonstrate that withholding them "is essential to preserve higher values and is narrowly tailored to serve that interest."  *Press-Enter. Co. v. Super. Ct.* ("*Press-Enterprise I*"), 464 U.S. 501, 510 (1984).  The Government does not even attempt to satisfy that stringent test, nor could it possibly do so on these facts.

Third, though the Government concedes that the Video Exhibits are subject to a strong presumption of public access under the common law, it claims that "privacy interests" in the videos and "the possibility of harm" from releasing them rebut that presumption.  Opp. at 9-16.  That argument misconstrues or simply ignores the D.C. Circuit's common law access decisions, and it fails to articulate any particularized risk of harm from releasing these specific videos.

For each of these reasons, and those set out below and in the Press Coalition's initial brief, the Court should grant the Press Coalition's motion and release the Video Exhibits.

I.        **This Court Has the Authority To Unseal The Video Exhibits.**

The Government asserts that the Video Exhibits "are not on file with or in the possession of this Court." Opp. at 4. The Federal Rules of Criminal Procedure, however, instructed the U.S. District Court for the Northern District of West Virginia to "promptly transmit the papers" of this case to this Court following the March 22, 2021 detention hearing, *see* Rule 5(c)(3)(E), and the Magistrate Judge duly ordered the clerk to "promptly transmit the papers" to this District, *see* Commitment To Another District & Detention Order, *U.S. v. Tanios*, 1:21-mj-27-MJA (N.D. W. Va. Mar. 22, 2021), Dkt. 26. Moreover, on March 31, 2021, the court in West Virginia sent this Court "one (1) thumb drive marked US v Tanios which was produced by the USA in these proceedings." *See* Letter, *U.S. v. Tanios,* No. 1:21-mj-27-MJA. (N.D. W. Va. Mar. 31. 2021), Dkt. 31. The transferring court further made it clear to the Press Coalition that, after Tanios's detention hearing, the criminal case "will now be handled in its entirety" by this Court and that the Press Coalition would need to seek relief from this Court "regarding release of any information regarding this matter." *See* Mem. Ex. A at 2, Dkt. 1-2. The transfer of "the papers" and the materials produced by the Government, and the delegation of any decision regarding the release of those records, together establish that <u>this</u> Court has authority to unseal the videos.

Notably, the Government never even mentions Rule 5(c)(3)(E) in its Opposition. Instead, it cites a series of out-of-Circuit cases in which one court declined to unseal materials that another court had previously sealed. Opp. at 4-5.[1] But the West Virginia court never docketed

---

[1] *See, e.g., Estate of Lagano v. Bergen Cty. Prosecutor's Office*, 2016 U.S. Dist. LEXIS 186202, at *3 (D.N.J. Nov. 9, 2016) (denying motion to enjoin a state court proceeding and unseal investigatory records in that court); *Casler v. Bressler*, 2005 U.S. Dist. LEXIS 50123, at *14 (E.D. Cal. Mar. 21, 2005) (denying request to unseal affidavit filed in state court in light of that court's prior denial of plaintiff's motion to unseal); *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 2007 U.S. Dist. LEXIS 107017, at *16-17 (D. Md. Sept. 17, 2007) (denying motion to unseal briefs filed under seal in another federal court).

3

any sealing order as to the Video Exhibits.  Rather, the clerk for the Northern District of West Virginia stated that the videos were "automatically restricted" as a matter of "national policy." *See* Mem. Ex. A at 2.  An order releasing the Video Exhibits therefore would not conflict with any prior rulings in this Court or any other.

The Government also cites a series of cases involving requests to unseal documents attached to search warrants.  Opp. at 4-5.  Pursuant to Rule 41(i) of the Federal Rules of Criminal Procedure, however, those particular documents must be delivered to the clerk of the court where the magistrate judge who executed the search warrant sits.  A specific court is therefore charged with making these specific records publicly available.  *See United States v. Scully*, 2013 U.S. Dist. LEXIS 92563, at *10 (E.D. Tex. July 2, 2013); *In re Application & Affidavit for a Search Warrant*, 923 F.2d 324, 328 (4th Cir. 1991).[2]  Unlike with search warrants, however, no specific court is charged under the Federal Rules with docketing and unsealing these Video Exhibits.  The responsibility thus falls to the Court in which the prosecution is pending – *i.e.*, to this Court.

The Government's position becomes even less workable in the context of the Capitol Riot cases as a whole.  Prosecutors have brought hundreds of such actions in this District, *see Capitol Breach Cases,* Dep't of Justice, https://www.justice.gov/usao-dc/capitol-breach-cases, and regardless of where those defendants happen to be arrested and make their initial appearances, all of the evidence submitted in connection with their cases will ultimately transfer

---

[2] The Government also cites *In re Granick*, where the movant broadly requested that the court unseal "all applications, motions, opposition briefs, orders, and/or warrants filed under the Wiretap Act, the Stored Communications Act, the Pen Register Act, and/or the All Writs Act," and that the court implement a policy of periodically reviewing materials in these types of cases and unsealing them.  2018 U.S. Dist. LEXIS 222975, at *46 (N.D. Cal. Dec. 18, 2018).  The court denied this request because it would reach "the orders and cases of other judges, untethered from the individual facts and circumstances of those cases."  *Id.*  Here, the Press Coalition requests that this Court unseal specific exhibits based on the facts and circumstances of this case.

4

here, *see* Fed. R. Crim. P. 5(c)(3)(E).  As a matter of consistency and judicial economy, therefore, these access issues should be adjudicated in this District, as the Press Coalition requests, rather than in a patchwork of rulings from dozens of courts across multiple Circuits.

This Court is presiding over this action arising out of events that took place in this District.  The authority to unseal the records of this case therefore rests with this Court as well.

## II.     The First Amendment Right Of Access Compels The Release Of These Videos

As the Press Coalition explained in its initial brief, the First Amendment right of access attaches to the Video Exhibits, and the Government cannot possibly carry its heavy burden to overcome that right.  Mem. at 8-11.  The Government dances around the first point and simply ignores the second, thereby conceding it.[3]

In disputing that the First Amendment right of access applies to the Video Exhibits, the Government chiefly relies on *Nixon v. Warner Communications, Inc.*, 435 U.S. 589 (1978).  *See* Opp. at 6-8.  That ruling, however, pre-dates the Supreme Court's application of the First Amendment to judicial records and proceedings in criminal cases in the first place.  *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980).  The D.C. Circuit has accordingly stated that because "a First Amendment right of public access was not raised and not explicitly decided" in *Nixon*, that decision is "not . . . particularly helpful" for evaluating whether the right of access attaches to judicial records as well as to judicial proceedings.  *See In re Reporters Comm. for Freedom of Press,* 773 F.2d 1325, 1331 (D.C. Cir. 1985) (further noting

---

[3] *See, e.g.*, *Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a [non-moving party] files an opposition to a dispositive motion and addresses only certain arguments raised by the [movant], a court may treat those arguments that the [non-moving party] failed to address as conceded."), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004).

that *Nixon*'s holding "was expressly tied closely to 'all the circumstances of [that] concededly singular case'"). *Nixon*, therefore, does not bear the weight the Government tries to place on it.

The Press Coalition, by contrast, chiefly relies on *Press-Enterprise Co. v. Superior Court* ("*Press-Enterprise II*"), 478 U.S. 1 (1986), where the Supreme Court squarely held that the First Amendment right of access applies to preliminary hearings in criminal cases. Mem. at 9. The Government responds by trying to narrow the scope of *Press-Enterprise II*, stating that "the Supreme Court held only that the First Amendment right of public access applies 'to preliminary hearings *as conducted in California*.'" Opp. at 8 (Government's emphasis) (quoting *Press-Enterprise II*, 478 U.S. at 10-12). But the Supreme Court expressly rejected such a narrow interpretation of *Press-Enterprise II* less than a decade after handing down that decision.

In *El Vocero de P.R. v. Puerto Rico*, a reporter was barred from attending a preliminary hearing because Puerto Rico Superior Court Rule 23(c) provided that such hearings "'shall be held privately' unless the defendant requests otherwise." 508 U.S. 147, 148 (1993) (per curiam). The Supreme Court of Puerto Rico distinguished *Press-Enterprise II* and upheld the rule "because of several differences between Rule 23 hearings and the California hearings at issue there." *Id.* at 149. The U.S. Supreme Court reversed, however, holding that the access test "does not look to the particular practice of any one jurisdiction, but instead to the experience in that type or kind of hearing throughout the United States," and that "[t]he established and widespread tradition of open preliminary hearings among the States was canvassed in [*Press-Enterprise II*] and is controlling here." *Id.* at 150-51 (citation and internal marks omitted). The Supreme Court thus rejected the exact same, narrow gloss on *Press-Enterprise II* that the Government offers here. *See also United States v. Brice*, 649 F.3d 793, 795 (D.C. Cir. 2011) ("the Supreme Court

6

has found that the public has a right of access to . . . preliminary hearings") (citing *Press-Enterprise II*, 478 U.S. at 7-10).

The Government alternatively suggests that, even if the First Amendment right of access applies to preliminary hearings generally, courts have yet to clarify whether the right applies to exhibits filed at detention hearings specifically. Opp. at 7-9. That is incorrect: courts have long concluded that the right of access does attach to judicial records associated with pretrial hearings, not just to the hearings themselves. *See, e.g.*, *Seattle Times Co. v. U.S. Dist. Ct.*, 845 F.2d 1513, 1517 (9th Cir. 1988) ("[T]he press and public have a right of access to pretrial release proceedings and documents filed therein."); *In re New York Times Co.*, 828 F.2d 110, 114 (2d Cir. 1987) ("[O]ur analysis clearly indicated that the First Amendment right of access applicable to a [pretrial] suppression hearing extends to the exhibits at the hearing.") (citing *In re Herald Co.*, 734 F.2d 93, 101 (2d Cir. 1984)); *In re Globe Newspaper Co.*, 729 F.2d 47, 52 (1st Cir. 1984) ("the public has a First Amendment right of access to pretrial proceedings setting and modifying bail, and to the documents on which the bail decisions are based"); *Associated Press v. U.S. Dist. Ct.*, 705 F.2d 1143, 1145 (9th Cir. 1983) ("There is no reason to distinguish between pretrial proceedings and the documents filed in regard to them. Indeed, the two principal justifications for the first amendment right of access to criminal proceedings apply, in general, to pretrial documents."). Courts have thus agreed with the Press Coalition's argument that the First Amendment right of access to the pretrial phase of criminal cases includes both access to proceedings and to exhibits and other filings associated with those proceedings.

Indeed, courts have often rejected the false distinction that the Government is trying to draw here between access to proceedings and access to records. In *Globe Newspaper Co. v. Superior Court*, the Supreme Court explained that the constitutional right of access "enhances

7

the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole," that it also "fosters an appearance of fairness, thereby heightening public respect for the judicial process," and that it further "permits the public to participate in and serve as a check upon the judicial process – an essential component in our structure of self-government." 457 U.S. 596, 606 (1982).[4]  Providing access only to proceedings and not records, or vice versa, would detract from those important goals instead of advancing them.  As the Third Circuit articulated this point more than 25 years ago:

> True public access to a proceeding means access to knowledge of what occurred there.  It is served not only by witnessing a proceeding firsthand, but also by learning about it through a secondary source.  In fact, recognition of the crucial role of secondary representation is the basis for the Court's protection of the rights of the media, who have been described by the Court as functioning as surrogates for the public.  Access to the documentation of an open proceeding, then, facilitates the openness of the proceeding itself by assuring the broadest dissemination. . . . [F]or what exists of the right of access if it extends only to those who can squeeze through the door?

*United States v. Antar*, 38 F.3d 1348, 1360 (3d Cir. 1994); *see also, e.g.*, *Hartford Courant Co. v. Pellegrino,* 380 F.3d 83, 91-93 (2d Cir. 2004) (collecting cases and stating that the Second Circuit "has followed a similar logic, deeming that the right to inspect documents derives from the public nature of particular tribunals").

---

[4] As Justice Oliver Wendell Holmes eloquently noted, during his service on the Massachusetts Supreme Judicial Court:

> It is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed.

*Cowley v. Pulsifer*, 137 Mass. 392, 394 (1884).

Here, given the emphasis that it, the Defendant, and the Magistrate Judge placed on the Video Exhibits, the Government cannot deny in this Court how central that evidence was in the decision to keep Tanios in detention prior to trial. At the hearing, the Government emphasized that "[t]he Court has for its consideration video footage from various sources, various angles that captured Mr. Tanios['s] and [his co-defendant's] conduct," and that this "video surveillance[] weighs in favor of detention." Detention Hrg. Tr. at 96:22-97:3, *U.S. v. Tanios*, No. 1:21-mj-27-MJA (N.D. W. Va. Mar. 22, 2021). Defense counsel called that argument "absurd" and responded that the videos "don't show anything but interpretation of the government's thoughts on what they think it shows." *Id.* at 104:13-22. The Magistrate Judge then expressed agreement with the Government, stating that he did not "think [he had] ever seen anything play out in a way that was more dangerous to our community." *Id.* at 111:23-112:3.

The public cannot meaningfully evaluate that decision – and thus cannot "serve as a check on the judicial process," *see Globe Newspaper Co.*, 457 U.S. at 606 – without viewing the Video Exhibits for themselves. That is why the right of access attaches to pretrial hearings and to the exhibits entered in connection with those hearings. *See Richmond Newspapers*, 448 U.S. at 572 ("People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing.").

The First Amendment right of access thus applies not only to Tanios's pretrial detention hearing but also to the exhibits shown at that hearing – including the Video Exhibits that proved especially influential to the Magistrate Judge's ruling. Because the right of access attaches, the Video Exhibits must be released unless the Government can demonstrate that withholding them "is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise I*, 464 U.S. at 510. The Government's failure even to <u>attempt</u> to satisfy this standard

9

amounts to a concession that it cannot do so. *See Hopkins*, 284 F. Supp. 2d at 25. The Court should therefore release the Video Exhibits without delay.

**III.   The Common Law Right Of Access Also Requires The Release Of These Videos**

The Video Exhibits also should be released pursuant to the common law right of access. Like the constitutional right of access, the common law access right requires courts to conduct a two-step analysis, first asking whether the right of access applies to the records at issue, then determining whether that right of access is overcome. The Government concedes that the common law right of access applies to these judicial records, and that a "strong presumption in favor of public access" accordingly applies to them as well. Opp. at 9-10 (quoting *Leopold v. United States*, 964 F.3d 1121, 1127 (D.C. Cir. 2020)). The Video Exhibits must be released, therefore, unless the Government overcomes that "strong presumption" of access.

The Government plainly fails to do so under the six-factor test set out in *United States v. Hubbard*: (1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial proceedings. 650 F.2d 293, 317-22 (D.C. Cir. 1980). Indeed, the Government concedes that Factors 2 and 6 support disclosure, *see* Opp. at 12-13, 16, and the balance of the other factors likewise weigh squarely in favor of disclosure.[5]

**Factor 1:** Factor 1 addresses "the need for public access to the documents at issue." *Hubbard*, 650 F.2d at 317-18. Here, the need for public access to the Video Exhibits is great

---

[5] The Press Coalition recognizes that, because the Government objects, Factor 3 weighs against disclosure, though it bears note that Tanios himself has not objected. *See* Notice, Dkt. 3.

10

because "[w]ithout access to the sealed materials, it is impossible to know which parts of those materials persuaded the court and which failed to do so (and why)." *MetLife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 668 (D.C. Cir. 2017) (Garland, J.); *see also id.* at 674-75 (recognizing "a fundamental norm of our judicial system: that judges' decisions *and their rationales* must be available to the public") (emphasis added). As discussed above, *see supra* at 8-9, that is precisely the problem the public faces here, knowing that the Magistrate Judge's decision was based in part on the Video Exhibits but being unable to view those videos for themselves. *See EEOC v. Nat'l Children's Ctr.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996) (recognizing that the need for public access to judicial records is especially great where "the documents at issue are specifically referred to in the trial judge's public decision") (alterations and internal marks omitted).

The Government responds that "the need for public access is surely less here" because "the public and members of the press were able to watch the videos and report upon them." Opp. at 12. The Third Circuit has already exposed the fault in that argument, however, explaining that "*openness* is ongoing—a status rather than an event. At the heart of the Supreme Court's right of access analysis is the conviction that the public should have access to *information*; the Court never has suggested that an open proceeding is only open to those who are able to be bodily present in the courtroom itself." *Antar*, 38 F.3d at 1360 (emphasis in original). Open access to court records is equally as important for those who did not or could not watch streaming video of this particular pretrial hearing – one of many happening each day – while it was proceeding live.

The first *Hubbard* factor thus weighs in favor of disclosing the Video Exhibits.

**Factor 4**: Factor 4 asks about "the strength of [any] property and privacy interests asserted" by the party favoring secrecy. *Hubbard*, 650 F.2d at 320. Here, the Government

asserts that it "has a strong privacy interest in the videos from its closed-circuit video system." Opp. at 13. As an initial matter, the Government has tacitly conceded this factor as to the Video Exhibits that are <u>not</u> derived from the Capitol's closed-circuit surveillance system by not asserting any privacy interest as to them. *See id.* at 3 (noting that of the ten Video Exhibits, six are from the closed-circuit system, "three were from police officers' body-worn cameras; and one was obtained from open source media"). Even as to the closed-circuit surveillance videos, however, the Government fails to substantiate its claimed privacy claims.

The notion that a "privacy interest" remains in these Video Exhibits is flawed in two respects. For one, the Capitol's interior and exterior are no secret, especially now that video from inside and outside the Capitol has been widely disseminated. *See, e.g.*, Stephanie McNeal, *Here Are Some Of The Most Horrifying And Stunning Videos From The Assault On The Capitol*, BuzzFeed (Jan. 6, 2021), https://www.buzzfeednews.com/article/stephaniemcneal/videos-of-capitol-riot (compiling 20 videos of the riots shared online, half from inside the Capitol); Lena V. Groeger et al., *What Parler Saw During the Attack on the Capitol*, ProPublica (Jan. 17, 2021) https://projects.propublica.org/parler-capitol-videos/ (compiling "more than 500 videos" taken during the January 6 riots and shared on the social media service Parler). The FBI itself has made footage from inside the Capitol available online in a request for public assistance in identifying suspects. *U.S. Capitol Violence*, FBI, https://www.fbi.gov/wanted/capitol-violence.

For another, these videos were shown at least in part to the public at Tanios's detention hearing. *See* Opp. at 3 ("Some of the videos were played in full during Tanios's detention hearing; for others, only clips were played."). Moreover, Capitol surveillance video has been made public multiple times in connection with the riot, most notably in President Trump's second impeachment trial. *See, e.g.*, *See full video of how insurrection at Capitol unfolded*, CNN

(Feb. 10, 2021), https://www.cnn.com/videos/politics/2021/02/10/security-footage-capitol-riot-plaskett-timeline-impeachment-trial-two-vpx.cnn (Capitol security video shown at 13:40, 18:20, 22:24, 23:45, 34:20, 35:30); Decl. of Thomas A. DiBiase ("DiBiase Decl.) ¶ 13, Dkt. 4-1 (noting use of Capitol security footage in the impeachment trial); *Justice Dept. Video Shows Evidence of Alleged Baseball Bat Attack at Capitol Insurrection*, NBC Washington (Mar. 18, 2021) https://www.nbcwashington.com/news/local/justice-dep-video-shows-evidence-of-alleged-baseball-bat-attack-at-capitol-insurrection/2611920/ (showing Capitol security video released in the *Jackson* case after the Government took "no position" on the request for access).

The Government cannot possibly demonstrate that any meaningful privacy interest exists in these videos. They depict events involving hundreds or thousands of members of the public; these particular videos have been shown in open court; and many similar videos have been widely released to the public in recent days. Factor 4 of the *Hubbard* test thus favors disclosure.

**Factor 5**: The fifth *Hubbard* factor assesses the possibility of prejudice to those opposing disclosure, and here the Government asserts a "possibility of prejudice to the Capitol Police's ability to protect the U.S. Capitol and the Members of Congress who work there." Opp. at 15. That is a critical task, to be sure, but the Government has failed to demonstrate that releasing these videos would have any chance of making that task more difficult.

According to the Government, the concern over releasing the Video Exhibits is that "vulnerabilities and security weaknesses of the U.S. Capitol [could be] collected, exposed and passed on to those who might wish to attack the Capitol again." Opp. at 15 (quoting DiBiase Decl. ¶ 14).[6] But the D.C. Circuit addressed an analogous situation in *Washington Post v.*

---

[6] The DiBiase Declaration, which was executed five days before the Video Exhibits were even shown at Tanios's detention hearing, does not purport to raise any specific concerns over the release of these videos in particular.

*Robinson*, where the *Post* sought access to the plea agreement of a district employee who cooperated with an investigation into Mayor Marion Barry. 935 F.2d 282, 283-85 (D.C. Cir. 1991). The government argued that the record should remain sealed because it "was part of an ongoing criminal investigation that might be compromised or that might embarrass innocent parties if publicized," because "release of the agreement may [have made] it difficult to secure the cooperation of other witnesses," and because "the safety of [the cooperator] and his family would have been placed at risk." *Id.* at 291 (citation, internal marks, and alterations omitted). The Court of Appeals rejected these speculative concerns, reasoning that the substantial amount of already-public information about the investigation and the cooperator's involvement, including information reported by the press, meant that unsealing the plea agreement "could hardly have posed any additional threat to the ongoing criminal investigation." *Id.* at 292.

Moreover, it is not enough for the Government to assert that releasing the Video Exhibits creates some possibility of generalized prejudice – it must also demonstrate that alternative measures could not adequately redress that potential harm. For instance, in *In re NBC*, the D.C. Circuit held that the "right to inspect and copy" judicial records outweighed concerns that release might prejudice defendants' fair trial rights by tainting a future jury pool, because "voir dire has long been recognized as an effective method of rooting out such bias." 653 F.2d 609, 613-17 (D.C. Cir. 1981). Here, the Government does not address whether it has any means of mitigating its concerns short of continuing to seal judicial records of surpassing public interest and importance. But it is clear that such means are available, as Congress is already addressing the Capitol security vulnerabilities and weaknesses that are ostensibly at risk of exposure from releasing these videos. *See, e.g.*, *Capitol Security Review* at 1, Task Force 1-6 (Mar. 5, 2021), https://www.speaker.gov/sites/speaker.house.gov/files/20210315_Final_Report_Task_Force_1.6

14

_Capitol_Security_Review_SHORT.pdf (task force review undertaken "for the purpose of identifying actions or decisions that could be taken immediately or in the near-term to improve the security of the Capitol, Members, and staff"). Factor 5 of the *Hubbard* test thus weighs in favor of releasing the videos as well.

In sum, five of the *Hubbard* factors weigh in favor of disclosure, and only Factor 3, considering whether a party has objected to disclosure, weighs to the contrary. Because the Video Exhibits are subject to the "strong presumption" of access under the common law, this 5-1 *Hubbard* factor split means that the Government has failed to rebut that presumption. The Court should therefore release the Video Exhibits in full under the common law right of access as well as under the First Amendment.

## CONCLUSION

For the foregoing reasons and those set forth in its initial memorandum, the Press Coalition respectfully requests that this Court grant its motion and enter an order directing the Clerk to unseal the Video Exhibits immediately.

Dated: April 14, 2021                Respectfully submitted,

BALLARD SPAHR LLP

/s/ *Charles D. Tobin*
Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
1909 K Street, NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com
mishkinm@ballardspahr.com

*Counsel for the Press Coalition*

**CERTIFICATE OF SERVICE**

    I hereby certify that on this 14th day of April 2021, I caused true and correct copies of the foregoing to be served via electronic mail and U.S. Mail on the following:

Elizabeth B. Gross
L. Richard Walker
Federal Public Defender Office-Clk.
The Huntington Bank Bldg.
230 W. Pike St., Suite 360
Clarksburg, WV 26302
beth_gross@fd.org
richard_walker@fd.org

*Counsel for Defendant George Pierre Tanios*

                                             /s/ *Charles D. Tobin*
                                             Charles D. Tobin (#455593)